IN THE MATTER OF JAMES B. SEAGER, ET AL., INFANTS. JAMES H. SEAGER, GUARDIAN, V. GERTRUDE B. McCABE.

*Dower—Interest in mineral lands.*

Under the statutes of Michigan in relation to dower, a widow is entitled to dower rights in the royalties realized from the lease by the guardians of minor heirs of mineral lands which were undeveloped at the time of her husband's death, and solely valuable for the minerals afterwards discovered therein.

Appeal from Ingham. (Person, J.) Submitted on briefs May 11, 1892. Decided June 10, 1892.

Petition to determine the dower rights of defendant

in certain royalties. Petitioner appeals. Decree affirmed. The facts are stated in the opinion.

*Van Zile & Robson,* for appellant.

*Cahill & Ostrander,* for appellee.

McGRATH, J. Schuyler F. Seager died intestate in 1883, leaving surviving him his widow, Gertrude B. Seager, now Gertrude B. McCabe, and as his sole heirs James B. Seager, Harry R. Seager, Schuyler F. Seager, and Richard B. Seager. Administration was had upon the estate, and the estate fully administered upon, and the administrators discharged, and dower has never been assigned to the widow. Seager died possessed of an undivided five-twelfths interest in 40 acres of wild land in the Upper Peninsula, which was not improved, and was wholly valueless for agricultural purposes or lumbering. Its principal value, and practically its sole value, is in the deposits of iron ore contained in it. In his life-time he had sold an undivided five-twelfths interest in 80 acres adjoining the 40 above mentioned, expressly excepting and reserving in the conveyance—

"All mines and minerals whatsoever, unopened as well as opened, in and under the hereditaments hereby assured, with full liberty to enter upon said premises to search for, work, mine, and carry away any and all of said minerals: *Provided,* that reasonable compensation be made for all injuries which may be sustained by the owners or occupants for the time being of said premises, by reason of the prosecution of the mining and works aforesaid."

At the time of the death of Schuyler F. Seager no mine of iron ore or other mineral deposit of any kind had ever been discovered, opened, or worked on either parcel of said lands. In March, 1888, the minors, through James H. Seager and the widow, their general

guardians, upon petition to the circuit court, obtained permission to lease, and did lease, the said lands, premises, and mineral rights for the purpose of mining iron ore; and the general guardian of certain of said infants has in his hands, undistributed, the sum of $2,300, arising from royalties paid by the lessee under the aforesaid lease, which sum is derived wholly from the developments upon the 80 acres last named. James H. Seager, the general guardian of certain of said minors, files a petition to determine whether the widow is entitled to any portion of said sum by way of dower.

Our statute (How. Stat. § 5733) gives to the widow of every deceased person the use during her natural life of one-third of all the lands whereof her husband was seised of an estate of inheritance at any time during the marriage, unless she is lawfully barred thereof. Other sections of the statute provide that, in case of mortgaged lands, the widow shall be entitled to the interest or income of one-third of the surplus; that the widow shall be entitled to dower in aliened lands; that when the estate consists of a mill or other tenement which cannot be divided without damage to the whole, and in all cases where the estate cannot be divided by metes and bounds, dower may be assigned of the rents, issues, and profits thereof, to be had and received by the widow as a tenant in common with the other owners of the estate. These are the only prominent provisions made by the statute for the widow in case decedent shall leave issue.

The naked question raised is whether, under these statutory provisions, a widow is excluded from all interest in the minerals in lands which, at the time of the death of her husband, were unimproved and unproductive, although such lands may be rich in minerals, and were owned, held, and known as mining lands, and were chiefly and solely valuable for the minerals contained in them.

From my examination I have been unable to discover that this precise question has ever been passed upon by any court in this country. Text-writers generally, and in some of the following cases, none of which involve the question of an unopened deposit, the courts, lay down the rule that a widow is dowable of mines which had been opened at the death of the husband, but that she may not open new mines, even upon the land set apart to her as dower; in other words, that a widow is not dowable of mineral deposits where there is no opened mine. Washb. Real Prop. 166; 4 Kent, Comm. 41; 1 Bish. Mar. Wom. § 264; 1 Scrib. Dower (2d ed.), 200–206; *Freer v. Stotenbur*, 36 Barb. 641; *Hendrix v. McBeth*, 61 Ind. 473; *Lenfers v. Henke*, 73 Ill. 405; *Gaines v. Mining Co.*, 33 N. J. Eq. 603; *Coates v. Cheever*, 1 Cow. 460; *Reed v. Reed*, 16 N. J. Eq. 248; *Moore v. Rollins*, 45 Me. 493; *Billings v. Taylor*, 10 Pick. 460; *Neel v. Neel*, 19 Penn. St. 323; *Irwin v. Covode*, 24 Id. 162; *Sayers v. Hoskinson*, 110 Id. 473 (1 Atl. Rep. 308); *Findlay v. Smith*, 6 Munf. 134; *Crouch v. Puryear*, 1 Rand. (Va.) 258; *Clift v. Clift*, 87 Tenn. 17 (9 S. W. Rep. 198).

*Sayers v. Hoskinson* holds that it is the right of a life-tenant to work an opened mine to exhaustion. *Moore v. Rollins* is to the same effect.

In *Freer v. Stotenbur*, which was a case of a tenant for years under a lease, the court say:

"A tenant for life or for years, or for a single year, has the right to work a mine or quarry that has been worked and is open at the commencement of his tenancy, *for it has become the mere annual profit of the land.*"

The English rule respecting an unopened mine is recited, but the court expressly refrain from determining the case upon that ground, but instead find that the right to quarry and take away stone was granted by the lease.

In *Irwin v. Covode* it was held that a court might restrain unskillful mining and wanton injury to the inheritance by a tenant for life, but not such mining as is subject to no other objection than its liability to exhaust the mine. The court say:

"It is said that on the western slope of the Alleghanies the seams of bituminous coal are so few and thin that tenants for life, if permitted to introduce modern facilities for mining, would exhaust lands so held, and leave them ruined on the hands of those in succession. Should this happen, it would be no more than occurs in every life-estate in chattels which perish with the using. So long as the estate is used *according to its nature,* it is no valid objection that the use is consumption."

In *Coates v. Cheever* the tract of land in question embraced 430 acres, and the pits had been opened by the husband, but the mining had been abandoned, and the pits had filled in by a caving in of earth and stone, and after the death of the husband a new pit had been sunk, extending the opening and operations; and the court held that the wife was entitled to—

"One-third of the whole estimated value of the property, deducting the value of the improvements made since the sale by her husband. If practicable, they should have given her a proportion of the ore-bed, assigning to the tenant his own improvements. If such a division was impracticable, then they should have directed an alternate occupancy of the whole or a share of the profits, always securing to the tenant, under our statute, his own improvements, or a suitable allowance for the use of them."

In *Neel v. Neel* the wife had a life-estate under a will, and the only question was whether a tenant for life of land having coal mines opened upon it may mine the coal, not only for his own use, but for sale. The court say:

"It seems in this case that the author of the gift had sometimes sold coal out of these pits, but I do not conceive this to be material. It is sufficient that he opened

them, and derived any profit from them, even if it were only *fire bote*. The facts of his opening the pits made the coal a part of the profits of the land, and the right to them will pass as such by a devise of a life-estate. If he · meant otherwise, he should have said so; not having said so, this is the legal inference of his intention. * * * The most obvious inference would seem to be that, when a man devises land with an open mine upon it to a person for life, he intended the devisee to derive profit from the mine as well as from the surface of the land. He may not have supposed that the devisee would exhaust the mine, and this might seem unreasonable; but, when the donor did not see proper to restrain the gift, how shall it be done? Surely courts have no such control over the arrangements which people choose to make of their affairs. Usually an enterprising tenant for life may be of advantage to the remainder-man, but, in the case of mines, it may be the reverse. And I cannot see how the enterprise of the citizen is to be restrained by judicial process. If we could get ourselves freer from the notions derived from feudal subordination, we would perhaps think that the privileges of tenants for life should be enlarged, rather than restrained, and that the cultivation of the country would be thereby improved."

In *Billings v. Taylor* the husband died seised of a tract of land 4 acres in extent, consisting of a slate quarry, mostly below the surface of the ground. One-quarter of an acre of the quarry had been dug over, and the practice was to take a section of 10 or 12 feet square on the surface, and go down to a certain depth, and then begin on the surface again. The court say:

"It would be too narrow a construction to say that no part of this quarry was opened except that portion which had actually been dug, but it must be considered that the whole, lying together as one tract, belonging to one estate, and wrought in the manner described, was opened, and that the widow was entitled to dower in that as well as the other estate of her husband."

In *Crouch v. Puryear* it was held that it was not waste in a tenant in dower of coal lands to take coal to any

extent from a mine already opened, or to sink new shafts into the same veins of coal.

In *Gaines v. Mining Co.*, held, that a life-tenant has a right to use a mine for his own profit, when the owner of the fee in his life-time had opened it, even though he may have discontinued work upon it for a long period of years.

In *Reed v. Reed*, held, that the operating of an opened mine was a *mode of enjoyment of the land* to which a tenant for life was entitled.

In *Findlay v. Smith*, held, that a devisee for life was entitled to the unlimited use of the salt mineral, and of the wood upon the premises for fuel, used in the production of salt from the brine.

It has been held that, if the mode of using the land consisted in cutting the growth upon it as the customary source of profit, the widow may continue to do so. Thus to cut and sell staves and shingles or hoop-poles under the circumstances supposed would not be waste. *Ballentine v. Poyner*, 2 Hayw. (N. C.) 110; *Clemence v. Steere*, 1 R. I. 272.

The doctrine that a widow is not dowable of mining lands, unless at the time of the death of her husband mines had been opened, is traceable to *Stoughton v. Leigh*, 1 Taunt. 402. There decedent left a large estate, upon which there was a lead and a coal mine, neither of which had been opened; two other lead and two coal mines, which he had leased to tenants, reserving certain rents, which were to be paid whether the tenants did or did not open the mines, one of each class of which mines had been opened at the time of his death; a lead and a coal mine, which he had leased, reserving royalties payable in ore and coal, and which coal mine had been opened at the time of his death, but the lead mine had not. Two other lead mines and two other coal mines

had been opened. Deceased was also entitled to minerals lying under lands not his own, and had operated certain mines thereon, and others were unopened. The court held that the wife was dowable of all the opened mines, but was not dowable of the mines or strata which had not been opened, whether owned by lease or not. The decision may not be without reason, but certainly no reasons are given in the opinion. Clearly, as to those lands which had been leased, they had been by the decedent devoted to mining purposes, and the mode of enjoyment and source of profit, under all the authorities, had been fixed and determined by the decedent; and, as to the rents which were to be paid whether the mines were opened or not, under all the authorities on the subject of dower, the widow was entitled to participate in them.

The rule laid down in that case undoubtedly had its origin in cases where the relation of landlord and tenant existed. A tenant who rents a farm cannot cut and sell the timber therefrom, convert the farm into a brick-yard, open a stone quarry or sand-pit, bore for oil, or mine for ore thereon, unless authority so to do is expressly given or arises by implication from the situation; but one who rents a piece of ground upon which there is an open quarry or sand-pit or brick-yard, or open mine, may quarry, take out sand, make brick, or operate the mine, unless there is either an express reservation, or some condition or circumstances which would operate as an implied restriction. One who leases a copper mine may mine for copper, but, if he should strike a pocket of silver, the same rule would prohibit him from appropriating the silver. The Salt-well Case, where the vein of petroleum was tapped, is an illustration of the principle underlying this class of cases. *Kier v. Peter-*

*son,* 41 Penn. St. 361. The question in that class of cases is one of interpretation of the contract,—of what was the use granted,—and, as bearing upon that question, the condition of the premises, the use to which the premises had been devoted, and the source of profit are important considerations; but there is room for but one construction where there is but one mode of enjoyment, one source of revenue or profit, one use. Suppose that a lease were given by A. of all his mining lands, or a devise were made for life of a gravel bank, although no mine or pit had been opened, and the lands were available for no other purpose, or were adapted to no other use, from which any considerable revenue could be derived, and suppose such grant were made to a wife or child, could it be contended for a moment that the ordinary methods of use or enjoyment of such lands were not to he adopted; that the usual mode of deriving revenue from such lands was not to be resorted to; that such land was not to be used "according to its nature?"

In 7 Bac. Abr. 262, it is said that where a man grants all his mines of coal, when none are open, the tenant may open new mines.

Mr. Park in his work on Dower, cited in 1 Scribner, 203, says:

"Mines in a man's own lands are clearly so far from being distinct inheritances that they are merely a mode of enjoyment. The right to the soil is the right to the profits of it, subject only to such restrictions as the law has imposed upon the owners of particular estates with respect to the mode of enjoying those profits."

Blackstone says (2 Bl. Comm. § 18):

"If a man grants all his lands, he grants thereby all his mines of metal and other fossils, his woods, his waters, and his houses, as well as his fields and meadows."

As is said in *Lenfers v. Henke, supra:*

"Land comprehends all things of a substantial nature, which includes any ground, soil, or earth whatever, and hath in its legal signification an indefinite extent upwards as well as downwards.    *    *    *    Minerals are a part of the land itself, and, if not susceptible of division, the wife is entitled to be endowed of the profits or rents."

In *Gaines v. Mining Co., supra,* the court say:

" In a country like this, where there are such vast bodies of unimproved lands, which would otherwise lie dormant in the hands of the life-tenant, public policy requires that the doctrine of waste should be liberalized, and the decisions have uniformly been in that direction.    The present case illustrates the hardship of a close rule in favor of the fee.    The life-estate vested in 1860, and there is an expectancy of 20 years more of this life. A construction of the law which locks up the land from all beneficial use for so long a period, and gives the life owner only the privilege of paying the land tax, should not be favored.    When the property is unimproved land, not adaptable to any other beneficial use than that of mining, the right of the life-tenant to use it reasonably for such purpose has some support in the adjudications in this country, and is certainly not without reason to uphold it."

In *Hickman v. Irvine,* 3 Dana, 121, the court say:

" We cannot concede that a widow is entitled to dower in the improved lands only of her deceased husband. She is, by the general provision of the common and statute law, to be endowed of one equal third part of all the lands of which he was seised during the coverture; and, to whatever extent the doctrine of forfeiture for waste may apply to the case of a dowress who reduces forest lands to a state of cultivation, we cannot view this doctrine, and the possibility that its application may render a portion of the dower lands useless to the widow, as a limitation either upon the quantity or quality of the land to be assigned as a dower.    When a case shall occur in which the lands assigned for dower cannot be made available for the reasonable support of the widow without converting a portion of the woodland to the pur-

poses of cultivation, and in which, upon an attempt being made thus to render it available, the reversioner shall insist upon a forfeiture, it must be decided upon consideration of the object of the law in establishing the right of dower, upon a comparison of its regard for the present comfortable sustenance of the widow with its care for the preservation of the inheritance, and upon a view of the actual condition of the estate and of the surrounding country with regard to improvement and population, whether the change of timbered into arable land is in the particular case such an act of waste as would be just cause of forfeiture."

The strict rules of the common law of England respecting waste and the rights of tenants for life do not obtain here. With us the change in the mode of use is not waste. It is not use, but abuse, that is waste. Waste must be consumption, nor is consumption always waste. The owner of a life-estate has some rights in common with the owner of the fee. There is no substantial reason why, so far as the use of premises is concerned, there should not be a community of right between the owner of the life-estate and the owner of the reversion.

Our statute respecting "dower" defines it as the use for life of one-third *of all the lands* of which the husband was seised during the marriage relation. "Dower" is defined by the English authorities as the provision which the law makes for a widow out of the lands or tenements of her husband for her support and the nurture of her children. Co. Litt. 30*b*; 2 Bl. Comm. 130. The rules applicable to a country where landed estates are large and diversified, where the laws of inheritance are exclusive, where the theory of dower is subsistence merely, and where there is a strong disposition to free estates from even that charge, do not obtain in a commonwealth like ours, where estates are small, and the policy of our laws is to distribute them with each generation, where dower is one of the positive institutions of the State, founded

in policy, and the provision for the widow is a part of the law of distribution, and the aim of the statute is not subsistence alone, but provision commensurate with the estate.

In the present case the grant is by operation of the statute giving the use of all the lands of which the husband was seised. The grant must be held to include the use of these lands, irrespective of whether mines were opened upon them before or after the husband's death. The question here is not the impairment of one mode of enjoyment or source of profit to reach another. There is but one mode of enjoyment of the land in question; but one source of revenue or profit. The land is susceptible of but one use.

The widow is therefore entitled to one-third of the amount in the hands of the petitioner, and the decree of the court below is affirmed.

The other Justices concurred.